**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEVIN JUNCO, derivatively on behalf of STUBHUB HOLDINGS, INC., | Case No.: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| ERIC H. BAKER, CONNIE JAMES, MARK STREAMS, SAMEER BHARGAVA, JEREMY LEVINE, JEFFREY BLACKBURN, RAJINI SUNDAR KODIALAM, and THOMAS A PATTERSON, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| STUBHUB HOLDINGS, INC. | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Kevin Junco ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant StubHub Holdings, Inc. ("StubHub" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Eric H. Baker ("Baker"), Connie James ("James"), Mark Streams ("Streams"), Sameer Bhargava ("Bhargava"), Jeremy Levine ("Levine"), Jeffrey Blackburn ("Blackburn"), Rajini Sundar Kodialam ("Kodialam"), and Thomas A. Patterson ("Patterson") (collectively, the "Individual Defendants," and together with StubHub, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of

StubHub, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and against Defendants Baker, James, Streams, Bhargava, and Levine for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding StubHub, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by StubHub's current and/or former directors and officers from September 17, 2025 through November 13, 2025, both dates inclusive (the "Relevant Period").

2.      StubHub operates the largest global ticketing marketplace for live events. Consumers can purchase tickets through the StubHub website, a separate online marketplace called Viagogo focused on regions outside of the United States, and mobile applications. On September 17, 2025, the Company's filed its prospectus on Form 424B4 (the "Form 424B4") with the SEC in connection with its Initial Public Offering ("IPO").

3.      Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements regarding the Company's free cash flow.

For example, the Form 424B4 stated that the Company's Trailing Twelve Month ("TTM") free cash flow was less impacted by seasonality and seller payments, stating, in relevant part, that "***TTM free cash flow provides a longer-term view of our business that is less impacted by the seasonality of GMS and seller payments***."[1]

4.    The truth emerged on November 13, 2025, when StubHub issued a press release reporting its financial results for the third quarter of 2025 (the "3Q 2025 Earnings Press Release"). The 3Q 2025 Earnings Press Release revealed free cash flow of ***negative $4.6 million*** for the third quarter of 2025, representing a ***143% decrease from the Company's free cash flow in the third quarter of 2024***.

5.    On the same day, StubHub filed its Quarterly Report on Form 10-Q with the SEC (the "3Q 2025 Form 10-Q"). The 3Q 2025 Form 10-Q revealed that the disappointing financial results were caused by "changes in the timing of payments to vendors." Specifically, the 3Q 2025 Form 10-Q stated, in relevant part:

> ***During the three months ended September 30, 2025, the decrease in free cash flow, compared to the same periods in the prior year, primarily reflects changes in the timing of payments to vendors.***
>
> During the nine months ended September 30, 2025, the decrease in free cash flow, compared to the same period in the prior year, primarily reflects changes in the timing of cash receipts and payments associated with ticket sales as well as timing of payments to vendors.
>
> During the period ended September 30, 2025, the decrease in TTM free cash flow, compared to the same period in the prior year, primarily reflects changes in the timing of cash receipts and payments associated with ticket sales as well as timing of payments to vendors.

---

[1] All emphasis has been added unless otherwise stated.

6.      On this news, the price of the Company's stock fell $3.95 per share, or 20.9%, from a closing price of $18.82 per share on November 13, 2025 to close at $14.87 per share on November 14, 2025.

7.      During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to StubHub, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) StubHub's vendors were changing the timing for their payments; (2) StubHub's free cash flow was severely impacted by these timing changes; and (3) as a result, the Company's free cash flow reports were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

8.      Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while three of the Individual Defendants engaged in improper insider sales, netting total proceeds of ***approximately $632,452***.

9.      The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its General Counsel and Chief Legal Officer ("CLO"), and two of its directors to a federal securities fraud class action pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), and which has further subjected the Company to the need to undertake

internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Baker's, James', Streams', Bhargava's, and Levine's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

18.     Plaintiff is a current shareholder of StubHub. Plaintiff has continuously held StubHub common stock at all relevant times.

**Nominal Defendant StubHub**

19.     StubHub is a Delaware corporation with its principal executive offices at 175 Greenwich Street, 59th Floor, 59th Floor, New York, New York 10007. StubHub shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "STUB."

**Defendant Baker**

20.     Defendant Baker co-founded the Company in 2000 and has served as CEO and Chairman of the Board since 2006. According to the Form 424B4, Defendant Baker owned 14,628,264 shares of Class A common stock and 24,750,000 of Class B common stock following the IPO. The Form 424B4 stated the following about the Company's concentration of ownership:

Immediately following this offering, all outstanding shares of our Class B common stock will be held by our Founder and Chief Executive Officer, Eric H. Baker, and such shares will represent approximately 87.8% of the voting power of our outstanding capital stock. As a result, Mr. Baker will have the ability to control the outcome of any action requiring the general approval of our stockholders, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and stockholder amendments to our bylaws, and the approval of any merger or sale of substantially all of our assets. Upon completion of this offering, we will be a "controlled company" within the meaning of the corporate governance rules of the NYSE, and are therefore permitted to elect not to comply with certain corporate governance requirements thereunder.

Thus, Defendant Baker is a controlling shareholder.

21.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Baker made the following sales of Company common stock:

| Date | Number of Shares | Avg.    Price/Share ($) | Proceeds ($) |
|------|------------------|------------------------|--------------|
| October 21, 2025 | 18,094 | $19.04 | $344,509 |

Thus, in total, before the fraud was exposed, Defendant Baker sold 18,094 shares of Company common stock on inside information, for which he received approximately $344,509 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

22.     The Form 424B4 stated the following about Defendant Baker:

***Eric H. Baker*** co-founded StubHub in 2000 and founded viagogo in 2006. He has served as our Chief Executive Officer and Chairman of the board of directors since 2006. Prior to founding StubHub and viagogo, Mr. Baker worked for McKinsey & Company, a management consulting firm, from 1995 to 1997 and Bain Capital, a private equity firm, from 1997 to 1999. Mr. Baker holds a Bachelor of Arts from Harvard College and received an MBA from Stanford Business School. We believe

Mr. Baker's experience in the industry and extensive business knowledge qualifies him to serve on our board of directors.

**Defendant James**

23.      Defendant James has served as the Company's CFO since August 2023.

24.      During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant James made the following sales of Company common stock:

| Date | Number of Shares | Avg.    Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| October 21, 2025 | 12,799 | $19.04 | $243,693 |

Thus, in total, before the fraud was exposed, Defendant James sold 12,799 shares of Company common stock on inside information, for which she received approximately $243,693 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

25.      The Form 424B4 stated the following about Defendant James:

***Connie James*** has served as our Chief Financial Officer since August 2023. Ms. James joined us from Light & Wonder (NASDAQ: LNW and ASX: LNW), a games and entertainment company, where she worked from January 2020 to August 2023 and most recently served as Chief Financial Officer, Treasurer and Corporate Secretary. From March 2019 to January 2020, Ms. James worked at Cargill, a global agriculture company, where she served as a Corporate Vice President of Finance. Prior to Cargill, she spent seven years at Aristocrat Leisure (ASX: ALL), a gaming and technology company, where she held the role of Chief Financial Officer of the Global Land Based Gaming division. Ms. James also previously served as a member of the board of directors of SciPlay Corporation. Ms. James holds a Bachelor of Science from the University of Nevada, Las Vegas and is a licensed CPA in the State of Nevada.

**Defendant Streams**

26.     Defendant Streams has served as the Company's General Counsel since 2011 and as a Company director since 2016. He has also served as the Executive Vice Chairman of the Board since April 2024 and as the Company's CLO since July 2025.

27.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Streams made the following sales of Company common stock:

| Date | Number of Shares | Avg.     Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| October 21, 2025 | 2,324 | $19.04 | $44,249 |

Thus, in total, before the fraud was exposed, Defendant Streams sold 2,324 shares of Company common stock on inside information, for which he received approximately $44,249 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28.     The Form 424B4 stated the following about Defendant Streams:

**_Mark Streams_** was appointed as our Executive Vice Chairman in April 2024. Before being appointed as Chief Legal Officer in July 2025, he served as our General Counsel since 2011. He has been a member of the board of directors since 2016. Mr. Streams holds a Bachelor of Arts from Duke University and a Juris Doctor from Harvard Law School. We believe Mr. Streams' experience in the industry and extensive legal knowledge qualifies him to serve on our board of directors.

### Defendant Bhargava

29.     Defendant Bhargava has served as a Company director since 2016. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

30.     The Form 424B4 stated the following about Defendant Bhargava:

***Sameer Bhargava*** has served on our board of directors since 2016. Mr. Bhargava has served since September 2022 as Chief Executive Officer of the Asset Solutions Group and Executive Vice President for Clark Construction Group LLC. Mr. Bhargava previously served as Chief Financial Officer and Executive Vice President of Clark Construction's Asset Solutions Group from 2016 to 2022. Prior to joining Clark Construction, Mr. Bhargava worked at The Carlyle Group from 2003 to 2016, as a Managing Director in their US Buyout funds and as head of Corporate Development. Prior to joining The Carlyle Group, Mr. Bhargava held a variety of roles at Bain Capital, Advent International, and McKinsey & Company. Mr. Bhargava is a board member of The Economic Club of Washington D.C., part of the Dean's Leadership Council at Harvard's Graduate School of Design, and a member of the DMV Regional Congress. Mr. Bhargava holds a Bachelor of Arts with honors in Biology from Harvard College and a Master of Business Administration with distinction from Harvard Business School. We believe that Mr. Bhargava's extensive business knowledge and experience in the financial services sector qualifies him to serve on our board of directors.

## Defendant Levine

31.    Defendant Levine has served as a Company director since March 2025. He also serves as a member of the Compensation Committee.

32.    The Form 424B4 stated the following about Defendant Levine:

***Jeremy Levine*** has served on our board of directors since March 2025. Since 2001, Mr. Levine has served as a partner at Bessemer Venture Partners, a venture capital and private equity firm, where his investment experience includes entrepreneurial startups and high growth companies including consumer internet, consumer software and business software and services. Prior to joining Bessemer, Mr. Levine was Vice President of Operations at Dash.com Inc., an internet software publisher, from 1999 to 2001. Prior to Dash, Mr. Levine was an Associate at AEA Investors from 1997 to 1999. Previously, Mr. Levine was with McKinsey & Company as a management consultant from 1995 to 1997. Mr. Levine currently serves on the board of directors of Pinterest, Inc. and Shopify, Inc. and several private companies. Mr. Levine previously served on the board of directors of other certain public companies, including but not limited to, Yelp from 2005 to 2019. Mr. Levine graduated with a Bachelor of Science in Computer Science from Duke University. We believe that Mr. Levine's experience as a public and private company board director and in the investment, consumer internet, and consumer software spaces qualifies him to serve on our board of directors.

## Defendant Blackburn

33.    Defendant Blackburn has served as a Company director since the Company's IPO on September 17, 2025. He also serves as a member of the Audit Committee.

34.    The Form 424B4 stated the following about Defendant Blackburn:

*Jeffrey Blackburn* became a member of our board of directors upon the effectiveness of the registration statement of which this prospectus forms a part. Mr. Blackburn has held various positions at Amazon.com, Inc. for over two decades and served on its senior executive team for over a decade, including serving as Senior Vice President of Global Media & Entertainment from 2021 to 2023, Senior Vice President of Worldwide Business Development, Advertising & Entertainment from 2007 to 2020 and Vice President of Business & Corporate Development from 2004 to 2006. From March 2021 to May 2021, Mr. Blackburn served as a general partner and a member of the management committee of Bessemer Venture Partners, a venture capital and private equity firm. From 1995 to 1998, Mr. Blackburn worked as an investment banker at Morgan Stanley and Deutsche Bank. Mr. Blackburn currently serves as a member of the board of directors of Roku, Inc., DoorDash, Inc. and Universal Tennis LLC aka UTR Sports. Mr. Blackburn holds an MBA from Stanford Business School and an AB in economics from Dartmouth College. We believe that Mr. Blackburn's extensive experience in the digital media and technology industries qualifies him to serve on our board of directors.

**Defendant Kodialam**

35.    Defendant Kodialam has served as a Company director since the Company's IPO on September 17, 2025. She also serves as a member of the Audit Committee.

36.    The Form 424B4 stated the following about Defendant Kodialam:

*Rajini Sundar Kodialam* became a member of our board of directors upon the effectiveness of the registration statement of which this prospectus forms a part. Ms. Kodialam is an accomplished entrepreneur, co-founder, Chief Operating Officer and board director with over 25 years of experience driving sustainable business growth in financial services. Ms. Kodialam is Co-Founder Emeritus of Focus Financial Partners, a leading international partnership of independent wealth management firms. Ms. Kodialam served as Board Member and Chief Operating Officer of Focus Financial Partners (Nasdaq: FOCS) from July 2018 till September 2023 and as Co-Founder & Managing Director from 2006 to 2018. Prior to co-founding Focus, Ms. Kodialam worked at American Express from 1998 to 2005 where she served as a Vice President from 1999 to 2005, managing interactive services for the U.S. Consumer Card and Travel businesses. Prior to joining American Express, Ms. Kodialam was with McKinsey & Company. Ms. Kodialam holds a Bachelor of Arts from Delhi University, India, a Post Graduate Diploma in Management from the Indian Institute of Management, Ahmedabad and a Master

of Business Administration from the Columbia University Graduate School of Business. We believe that Ms. Kodialam's experience as founder and board member of several companies and her work in the financial services and consumer technology industries qualifies her to serve on our board of directors.

**Defendant Patterson**

37.     Defendant Patterson has served as a Company director since the Company's IPO on September 17, 2025.

38.     The Form 424B4 stated the following about Defendant Patterson:

***Thomas A. Patterson*** became a member of our board of directors upon the effectiveness of the registration statement of which this prospectus forms a part. Since 2005, Mr. Patterson has served as a General Partner at Madrone Capital Partners, an investment firm based in Menlo Park, California, where he has focused on investments in founder/family-owned businesses, the emerging middle class abroad and technology. Prior to joining Madrone, Mr. Patterson was at Weston Presidio, a private equity firm focused on growth equity and leveraged buyout transactions, from 1995 until 2004. Prior to Weston Presidio, Mr. Patterson worked for four years at McKinsey & Company, focused on the financial services and building materials industries. Mr. Patterson currently serves on the board of directors of Castleton Commodities and Teya Holdings Ltd. Mr. Patterson has previously served on the board of directors of StoneCo Ltd., a public financial technology company, from 2018 to 2022, as well as Barry-Wehmiller and Oportun Financial Corp. He is active in environmental conservation and Chairman of the Stanford Natural Capital Project Advisory Board. Mr. Patterson holds an MBA from Harvard Business School and an AB in history from Harvard College. We believe that Mr. Patterson's extensive experience and background in the financial services sector and working with founder-led businesses qualifies him to serve on our board of directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as controlling shareholders, officers and/or directors of StubHub and because of their ability to control the business and corporate affairs of StubHub, the Individual Defendants owed StubHub and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage StubHub in a fair, just, honest, and equitable manner. The Individual Defendants were and

are required to act in furtherance of the best interests of StubHub and its shareholders so as to benefit all shareholders equally.

40.    Each controlling shareholder, director, and officer of the Company owes to StubHub and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

41.    The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of StubHub, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

42.    To discharge their duties, the controlling shareholders, officers, and directors of StubHub were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43.    Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and/or officers of StubHub, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholders, officers, and/or directors of the

Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of StubHub's Board at all relevant times.

44.     As controlling shareholders, senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

45.     To discharge their duties, the controlling shareholders, officers, and directors of StubHub were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of StubHub were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to StubHub's own Code of Ethics and Conduct ("Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how StubHub conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of StubHub and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that StubHub's operations would comply with all applicable laws and StubHub's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

46.    Each of the Individual Defendants further owed to StubHub and the shareholders the duty of loyalty requiring that each favor StubHub's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

47.    At all times relevant hereto, the Individual Defendants were the agents of each other and of StubHub and were at all times acting within the course and scope of such agency.

48.    Because of their advisory, executive, managerial, directorial, and controlling positions with StubHub, each of the Individual Defendants had access to adverse, non-public information about the Company.

49.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by StubHub.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

51.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of StubHub was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

53.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of StubHub and was at all times acting within the course and scope of such agency.

**<u>STUBHUB'S CODE OF ETHICS</u>**

55.     The Company's Code of Ethics states it "applies to all directors, officers and employees." Specifically, the Code of Ethics states:

> All directors, officers and employees (each a "Covered Party" and, collectively, the "Covered Parties") of the Company and all of its subsidiaries and controlled affiliates are expected to be familiar with the Code and to adhere to the principles and procedures set forth below.

The Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer or Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

56.    Under the heading "Conflicts of Interest," the Code of Ethics states

A conflict of interest occurs when the private interests of a Covered Party interfere, or appear to interfere, with the interests of the Company as a whole.

For example, a conflict of interest can arise when a Covered Party takes actions or has personal interests that may make it difficult to perform his or her Company duties objectively and effectively. A conflict of interest may also arise when a Covered Party, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position at the Company.

Conflicts of interest can also occur indirectly. For example, a conflict of interest may arise when a Covered Party is also an executive officer, a major shareholder or has a material interest in a company or organization doing business with the Company.

Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company should be disclosed promptly to the Company's General Counsel.

This Code does not attempt to describe all possible conflicts of interest that could develop. Other common conflicts from which Covered Parties must refrain are set out below:

• Covered Parties may not engage in any conduct or activities that are inconsistent with the Company's best interests or that disrupt or impair the Company's relationship with any person or entity with which the Company has or proposes to enter into a business or contractual relationship.

• Covered Parties may not accept compensation, in any form, for services performed for the Company from any source other than the Company.

• No Covered Party may take up any management or other employment position with, or have any material interest in, any firm or company that is in direct or indirect competition with the Company. Whether a Covered Party has a material interest will be determined by the General Counsel or his or her designee in light of all of the facts and circumstances.

57.    Under the heading "Disclosures," the Code of Ethics states:

The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

58.    Under the heading "Compliance with Laws, Rules and Regulations," the Code of Ethics states:

The Company is obligated to comply with all applicable laws and governmental rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

59.    Under the heading "Insider Trading," the Code of Ethics states:

Trading on inside information is a violation of federal securities law. Covered Parties in possession of material non-public information about the Company or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal. Please refer to the Company's Insider Trading Compliance Policy and Procedures for more information.

60.    Under the heading "Reporting, Accountability and Enforcement," the Code of Ethics states:

The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation.

Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof. Reports may be made anonymously. If requested, confidentiality will be maintained, subject to applicable law, regulations and legal proceedings. Nothing in the Code prevents you from communicating directly with relevant government authorities about potential violations of law, without first notifying the Company.

The Audit Committee of the Board or other appropriate officer or body shall investigate and determine, or shall designate appropriate persons to investigate and determine, the legitimacy of such reports. The Audit Committee of the Board or other appropriate officer or body will then determine the appropriate disciplinary action. Such disciplinary action includes, but is not limited to, reprimand, termination with cause, and possible civil and criminal prosecution.

To encourage employees to report any and all violations, the Company will not tolerate retaliation for reports made in good faith. Retaliation or retribution against any Covered Party for a report made in good faith of any suspected violation of laws, rules, regulations or this Code is cause for appropriate disciplinary action.

61.     Under the heading "Protection and Proper Use of Company Assets," the Code of Ethics states:

All Covered Parties should protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability. All Company assets should be used only for legitimate business purposes. The obligation of employees to protect the Company's assets includes its confidential or proprietary information.

62.     Under the heading "Accuracy of Business Records," the Code of Ethics states:

All financial books, records and accounts must accurately reflect transactions and events, and conform both to generally accepted accounting principles and to the Company's system of internal controls. No entry may be made that intentionally hides or disguises the true nature of any transaction. Covered Parties should therefore attempt to be as clear, concise, truthful and accurate as possible when recording any information.

63.     Under the heading "Waivers," the Code of Ethics states:

Before an employee, or an immediate family member of any such employee, engages in any activity that would be otherwise prohibited by the Code, he or she is strongly encouraged to obtain a written waiver from the General Counsel.

Before a director or executive officer, or an immediate family member of a director or executive officer, engages in any activity that would be otherwise prohibited by the Code, he or she must obtain a written waiver from the disinterested directors of the Board. Such waiver must then be disclosed to the Company's shareholders, along with the reasons for granting the waiver.

64. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics and law.

## STUBHUB'S AUDIT COMMITTEE CHARTER

65. The Company's Audit Committee Charter (the "Audit Committee Charter") states that the purpose of the Audit Committee is as follows:

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of StubHub Holdings, Inc., a Delaware corporation (the "Company"), is to assist the Board in its oversight responsibilities with respect to: (i) the Company's accounting and financial reporting processes and the audits of the financial statements of the Company (ii) the integrity of the Company's financial statements; (iii) the Company's internal controls and procedures designed to promote compliance with accounting standards and applicable legal and regulatory requirements; (iv) the appointment of the independent auditor and the evaluation of the independent auditor's qualifications, independence and performance; (v) designated risk oversight matters; and (vi) the design and implementation of the Company's internal audit function and the performance of the Company's internal audit function after it has been established.

66.     Under the heading "Duties and Responsibilities," in a subheading titled "Interaction with the Independent Auditor," the Audit Committee Charter states, in relevant part:

> 3. Internal Controls. The Committee will discuss with management and the independent auditor the design, implementation, adequacy and effectiveness of the Company's internal control over financial reporting. The Committee will also meet separately with the independent auditor, with and without management present, to discuss the results of their examinations. The Committee will provide oversight over the system of internal controls, relying upon management's and the independent auditor's representations and assessments of, and recommendations regarding, these controls. The Committee will review any required disclosures regarding the Company's internal control over financial reporting.

67.     Under the same heading, in a subheading titled "Annual and Quarterly Financial Statements," the Audit Committee Charter states:

> 9. Form 10-K Review. The Committee will review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's annual report on Form 10-K prior to issuance or filing. The Committee will recommend to the Board, if appropriate, that the Company's annual audited financial statements be included in the Company's annual report on Form 10-K for filing with the SEC.

> 10. Form 10-Q Review. The Committee will review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's quarterly reports on Form 10-Q prior to issuance or filing.

68.     Under the same heading, in a subheading titled "Other Duties and Responsibilities," the Audit Committee Charter states that the Audit Committee is tasked with the following, in relevant part:

> 11. Review of Earnings and Financial Information. The Committee will review any earnings press releases or other financial information and earnings guidance provided to third parties, as applicable.

> 12. Risk Assessment and Risk Management. The Committee will review the Company's policies with respect to risk assessment and risk management. In order to facilitate this review, the Committee will meet in executive session with management, including the Company's General Counsel, and review reports of

management and representatives of any external advisors as appropriate. The Committee will provide regular reports to the Board.

*** 

16. Critical Accounting Policies. The Committee will review and discuss with management and the independent auditor the Company's critical accounting policies and significant changes in the Company's selection or application of accounting principles. This discussion will include alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, including ramifications of the use of such alternative disclosure and treatments, and the treatment preferred by the independent auditors and the impact of each on the quality and reliability of the Company's financial reporting, and other material communications with management, such as any management letter or schedule of unadjusted differences. The Committee will also review and discuss the effect of regulatory and accounting initiatives on the financial statements of the Company, and critical audit matters addressed during the audit.

17. Non-GAAP Financial Measures. The Committee will review with management the preparation, presentation and integrity of non-GAAP financial measures used by the Company. The Committee will review the non-GAAP financial measures to understand how management evaluates performance, whether the metrics are consistently prepared and presented from period to period, and the related non-GAAP disclosure policies.

18. Disclosure Controls and Procedures. The Committee will review and discuss with management, and to the extent the Committee deems necessary or appropriate, the independent auditor, the Company's disclosure controls and procedures that are designed to ensure that the reports the Company files with the SEC comply with the SEC's rules and forms.

19. Review of Code of Conduct. The Committee will periodically consider and discuss with management and the independent auditor the Company's code of conduct or other comparable policy and the procedures in place for the enforcement thereof.

*** 

22. Reports to the Board of Directors. The Chair of the Committee shall report to the Board regularly regarding the Committee's activities and actions, including at the first Board meeting following any Committee meeting.

69.    The Individual Defendants who served on the Company's Audit Committee during

the Relevant Period violated the Audit Committee Charter by engaging in or permitting the

Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Securities Act and the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

70.     StubHub is a New York company which operates the largest global ticketing marketplace for live events. Consumers in the United States can purchase tickets through the StubHub website or mobile applications. Consumers outside of the United States can purchase tickets through Viagogo, which is the Company's ticketing marketplace focusing on regions outside of the United States.

71.     On March 21, 2025, the Company filed a Form S-1 (the "Form S-1"), which forms part of the Registration Statement.

72.     On September 8, 2025, StubHub filed its final amendment to the Registration Statement on Form S-1/A with the SEC (the "Form S-1/A"), which forms part of the Registration Statement.

73.     The Company completed its IPO on September 17, 2025. As a result of the IPO, the Company sold approximately 34,042,553 shares of Class A common stock at a price of $23.50

per share. After underwriting discounts and commissions, the Company netted approximately $758 million, which the Company used to repay certain debts and satisfy anticipated tax withholding and remittance obligations. The IPO proceeds were also purportedly to be used for operating expenses, working capital, and capital expenditures.

**The False and Misleading Registration Statement**

74.    The Relevant Period began on September 17, 2025, when the Company filed the Form 424B4 with the SEC (together with the Form S-1 and Form S-1/A, the "Registration Statement").

75.    The Registration Statement represented that the Company believes "free cash flow is a meaningful indicator of liquidity for management and investors." Specifically, the Registration Statement stated, in relevant part:

> ***Free Cash Flow***
>
> We define free cash flow as net cash provided by (used in) operating activities less capital expenditures, which includes purchases of property and equipment, purchases of intangible assets and capitalized software development costs. We believe that free cash flow is a meaningful indicator of liquidity for management and investors and, in particular, the amount of cash generated from operations that, after capital expenditures, can be used for strategic initiatives, including continuous investment in our business and strengthening our balance sheet. A limitation of the use of free cash flow is that it does not represent the total increase or decrease in our cash balance for the period. Free cash flow should not be considered in isolation or as an alternative to cash flows from operations and should be considered alongside our other financial liquidity measures, such as net cash provided by (used in) operating activities and our other GAAP results.

76.    The Registration Statement also reported the Company's free cash flow for its previous fiscal years, stating:

| | Six Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2025 | 2024 | 2024 | 2023 | 2022 |
| | | | (in thousands) | | |
| Net cash provided by (used in) operating activities[1] | $177,641 | $398,578 | $ 261,487 | $ 307,391 | $ (47,521) |
| Less: Purchases of property and equipment | (798) | (680) | (1,666) | (1,722) | (1,648) |
| Less: Purchases of intangible assets | (942) | (1,182) | (2,086) | (1,706) | — |
| Less: Capitalized software development costs | (15,075) | (1,583) | (2,625) | (2,009) | (658) |
| Free cash flow | $160,826 | $395,133 | $ 255,110 | $ 301,954 | $ (49,827) |

77.     The Registration Statement represented, *inter alia*, that "[s]easonal trends in our GMS and the timing of major events throughout the year impact free cash flow" but that TTM free cash flow was less impacted by seasonal trends, stating:

> Seasonal trends in our GMS and the timing of major events throughout the year impact free cash flow for any given quarter and can vary year to year. For example, in 2024 an atypical concentration of seller payments resulted in negative free cash flow for the fourth quarter. As a result, we track our TTM free cash flow to account for the timing difference in when we receive cash, which is at the time of transaction, and when we remit cash to sellers, which is at a later date. ***TTM free cash flow provides a longer-term view of our business that is less impacted by the seasonality of GMS and seller payments.***
>
> For the year ended December 31, 2023, free cash flow was $302.0 million compared to free cash flow of $(49.8) million for the year ended December 31, 2022. The increase in free cash flow was driven by rapid growth of our business and operating leverage following the integration of StubHub, our capital-light business model and our favorable working capital dynamic, which drives cash flow generation as our GMS grows, offset by interest payments on our outstanding debt.
>
> For the year ended December 31, 2024, free cash flow was $255.1 million compared to free cash flow of $302.0 million for the year ended December 31, 2023. The decrease in free cash flow was primarily driven by a strategic decision to invest in new initiatives, such as direct issuance.
>
> In the first half of 2025, free cash flow was $160.8 million compared to free cash flow of $395.1 million in the first half of 2024. The decrease in free cash flow primarily reflects changes in the timing of cash receipts and payments associated with ticket sales as well as timing of payments to vendors.

78.     The Registration Statement also provided investors with a report of TTM free cash flow for the 2023 and 2024 fiscal years, representing the following:











79.    The Registration Statement also purportedly warned investors of risks related to the Company's operations possibly being impacted by the timing of guaranteed payments and receivables management. Specifically, the Registration Statement stated, in relevant part:

*Our results of operations vary from quarter to quarter and year over year, so our financial performance in certain financial quarters or years may not be indicative of, or comparable to, our financial performance in subsequent financial quarters or years.*

We believe our financial results and cash needs will vary greatly from quarter to quarter and year to year depending on, among other things, *the timing of and demand for certain tours, tour cancellations, event ticket sales, seasonal and other fluctuations in our results of operations, the timing of guaranteed payments, financing activities, acquisitions and investments and receivables management*. For example, the timing of and demand for top sporting events and concert tours, such as the Super Bowl, the UEFA Champions League Final, the FIFA World Cup, Elton John's "Farewell Yellow Brick Road" tour, Taylor Swift's "Eras" tour, can impact comparability of quarterly results year-over-year, and potentially annual results also. Similarly, the number of games or matches in sports playoff series, the teams involved and demand for certain games or matches can vary year-over-year and impact our results. We have in the past experienced variations in revenue based on the timing of and demand for certain experiences or events, such as major sports league seasons, the timing of certain international sporting events, tour schedules of certain artists and popular theater or concert events. Because our results may vary significantly from quarter to quarter and year to year, our financial results for one quarter or year cannot necessarily be compared to another quarter or year and may not be indicative of our future financial performance in subsequent quarters or years. Moreover, seasonality in our business could create cash flow management risks if we do not adequately anticipate and

plan for periods of decreased activity, which could adversely impact our ability to execute on our strategy, which in turn could harm our business, financial condition, results of operations and prospects.

80.     The above statements in ¶¶ 75-79 were materially false and misleading and failed to disclose, *inter alia*, that: (1) StubHub's vendors were changing the timing for their payments; (2) StubHub's free cash flow was severely impacted by these timing changes; and (3) as a result, the Company's free cash flow reports were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

### *November 13, 2025 Financial Reports*

81.     The truth emerged on November 13, 2025 when the Company filed the 3Q 2025 Earnings Press Release, therein reporting disappointing financial results. The 3Q 2025 Earnings Press Release reported free cash flow for the third quarter of 2025 of $4.6 million, representing a 143% decrease from the third quarter of 2024, which was positive $10.6 million. The 3Q 2025 Earnings Press Release additionally reported that net cash provided by operating activities decreased by 69.3% from the third quarter of 2024, a decline from $12.4 million in 2024 to $3.8 million in 2025. Specifically, the 3Q 2025 Earnings Press Release stated, in relevant part:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| | | (in thousands) | | |
| Net cash provided by (used in) operating activities[(1)] | $ 3,795 | $ 12,357 | $181,436 | $410,935 |
| Less: Purchases of property and equipment | (372) | (646) | (1,170) | (1,326) |
| Less: Purchases of intangible assets | (256) | (588) | (1,198) | (1,770) |
| Less: Capitalized software development costs | (7,767) | (521) | (22,842) | (2,104) |
| Free cash flow | $(4,600) | $ 10,602 | $156,226 | $405,735 |
| TTM free cash flow | $ 5,601 | $501,492 | $ 5,601 | $501,492 |

82.     On the same day, the Company filed the 3Q 2025 Form 10-Q, which was signed by Defendants Baker and James. The 3Q 2025 Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 which were signed by Defendants Baker and James attesting to the

accuracy of the 3Q 2025 Form 10-Q and that the 3Q 2025 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

83.    The 3Q 2025 Form 10-Q clarified that that the disappointing free cash flow results "***primarily reflect[ed] changes in the timing of payments to vendors***." Specifically, the 3Q 2025 Form 10-Q stated, in relevant part:

> ***During the three months ended September 30, 2025, the decrease in free cash flow, compared to the same periods in the prior year, primarily reflects changes in the timing of payments to vendors.***
>
> During the nine months ended September 30, 2025, the decrease in free cash flow, compared to the same period in the prior year, primarily reflects changes in the timing of cash receipts and payments associated with ticket sales as well as timing of payments to vendors.
>
> During the period ended September 30, 2025, the decrease in TTM free cash flow, compared to the same period in the prior year, primarily reflects changes in the timing of cash receipts and payments associated with ticket sales as well as timing of payments to vendors.

84.    The 3Q 2025 Form 10-Q also revealed the downward trend of free cash flow and TTM free cash flow in 2025, stating, in relevant part:[2]

| Three Months Ended | Free Cash Flow (in thousands) | TTM Free Cash Flow (in thousands) |
|---|---|---|
| September 30, 2025 | ($4,600) | $5,601 |
| June 30, 2025 | $9,716 | $20,803 |
| March 31, 2025 | $151,110 | $147,529 |
| December 31, 2024 | ($150,625) | $225,110 |
| September 30, 2024 | $10,602 | $501,492 |

---

[2] Table recreated for legibility.

85.     On this news, the price of the Company's stock fell $3.95 per share, or 20.9%, from a closing price of $18.82 per share on November 13, 2025 to close at $14.87 per share on November 14, 2025.

### DAMAGES TO STUBHUB

86.     As a direct and proximate result of the Individual Defendants' conduct, StubHub has lost and expended, and will continue to lose and expend, many millions of dollars.

87.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

88.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

89.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

90.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

91.     As a direct and proximate result of the Individual Defendants' conduct, StubHub has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

92.    Plaintiff brings this action derivatively and for the benefit of StubHub to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of StubHub, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act.

93.    StubHub is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

94.    Plaintiff is, and has continuously been at all relevant times, a shareholder of StubHub. Plaintiff will adequately and fairly represent the interests of StubHub in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

95.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

96.    A pre-suit demand on the Board of StubHub is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Baker, Streams, Bhargava, Levine, Blackburn, Kodialam, and Patterson (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Director-Defendants who are on the Board at the time this action is commenced.

97.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

98.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted StubHub to issue materially false and misleading statements. Specifically, the Director-Defendants caused StubHub to issue false and misleading statements which were intended to make StubHub appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

99.     Additional reasons that demand on Defendant Baker is futile follow. Defendant Baker founded the Company in 2000 and has served as the Company's CEO and as Chairman of the Board since 2006. Defendant Baker is also a controlling shareholder in the Company. The Company provides Defendant Baker with his primary occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Baker also signed the false and misleading Registration

Statement. Further, Defendant Baker's insider sales, which were made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Baker is a defendant in the Securities Class Action. For these reasons, too, Defendant Baker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

100.    Additional reasons that demand on Defendant Streams is futile follow. Defendant Streams has served as the Company's General Counsel since 2011 and as a Company director since 2016. He has also served as the Executive Vice Chairman of the Board since April 2024 and as the Company's CLO since July 2025. The Company provides Defendant Streams with his primary occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As a trusted, long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Streams also signed the false and misleading Registration Statement. Further, Defendant Streams's insider sales, which were made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Streams is a defendant in the Securities Class Action. For these reasons, too, Defendant Streams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

101.    Additional reasons that demand on Defendant Bhargava is futile follow. Defendant Bhargava has served as a Company director since 2016. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. As a trusted, long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Bhargava also signed the false and misleading Registration Statement. Moreover, Defendant Bhargava is a defendant in the Securities Class Action. For these reasons, too, Defendant Bhargava breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

102.    Additional reasons that demand on Defendant Levine is futile follow. Defendant Levine has served as a Company director since March 2025. He also serves as the Chair of the Compensation Committee. As a trusted, long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Levine also signed the false and misleading Registration Statement. Moreover, Defendant Levine is a defendant in the Securities Class Action. For these reasons, too, Defendant Levine breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.    Additional reasons that demand on Defendant Blackburn is futile follow. Defendant Blackburn has served as a Company director since the Company's IPO on September 17, 2025. He also serves as a member of the Audit Committee. As a trusted Company director, he conducted

little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Blackburn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

104.    Additional reasons that demand on Defendant Kodialam is futile follow. Defendant Kodialam has served as a Company director since the Company's IPO on September 17, 2025. She also serves as a member of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Kodialam breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

105.    Additional reasons that demand on Defendant Patterson is futile follow. Defendant Patterson has served as a Company director since the Company's IPO on September 17, 2025. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Patterson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

106.    Additional reasons that demand on the Board is futile follow.

107.    Defendants Bhargava (as Chair), Blackburn, and Kodialam (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Securities Act and the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

108.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

109.    StubHub has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for StubHub any part of the damages StubHub suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

110.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

111.    The acts complained of herein constitute violations of fiduciary duties owed by StubHub's officers and directors, and these acts are incapable of ratification.

112.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of StubHub. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of StubHub, there would be

no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

113.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause StubHub to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

114.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

115.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of StubHub's business and affairs.

117.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

118.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of StubHub.

119.    In breach of their fiduciary duties owed to StubHub, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) StubHub's vendors were changing the timing for their payments; (2) StubHub's free cash flow was severely impacted by these timing changes; and (3) as a result, the Company's free cash flow reports were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

120.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

121.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls while three of the Individual Defendants engaged in lucrative insider sales, netting combined total proceeds of approximately $632,452.

122.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of StubHub's securities.

123.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of StubHub's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

124.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

125.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, StubHub has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

126.    Plaintiff, on behalf of StubHub, has no adequate remedy at law.

<u>**SECOND CLAIM**</u>
**Against the Individual Defendants for Unjust Enrichment**

127.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

128.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, StubHub.

129.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from StubHub that was tied to the performance or artificially inflated valuation of StubHub or received compensation that was

unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

130.    Plaintiff, as a shareholder and a representative of StubHub, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

131.    Plaintiff, on behalf of StubHub, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

132.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

133.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

134.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused StubHub to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

135.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

136.    Plaintiff, on behalf of StubHub, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

137.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

138.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of StubHub in a manner consistent with the operations of a publicly held corporation.

139.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, StubHub has sustained and will continue to sustain significant damages.

140.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

141.    Plaintiff, on behalf of StubHub, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Abuse of Control

142.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence StubHub, for which they are legally responsible.

144.    As a direct and proximate result of the Individual Defendants' abuse of control, StubHub has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

145.    Plaintiff, on behalf of StubHub, has no adequate remedy at law.

## SIXTH CLAIM

**Against Defendants Baker, James, Streams, Bhargava, and Levine for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of StubHub shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

148.    Federal law provides StubHub with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

149.    The plaintiffs in the Securities Class Action allege that the Registration Statement issued in connection with the Company's Offering contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

150.    StubHub is the registrant for the Offering. Defendants Baker, James, Streams, Bhargava, and Levine were responsible for the contents and dissemination of the Registration Statement.

151.    As issuer of the shares, StubHub is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

152.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

153.     Defendants Baker, James, Streams, Bhargava, and Levine, because of their positions of control and authority as controlling shareholders, officers and/or directors of StubHub, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of StubHub, including the wrongful acts complained of herein and in the Securities Class Action.

154.     Accordingly, Defendants Baker, James, Streams, Bhargava, and Levine are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

155.     As such, StubHub is entitled to receive all appropriate contribution or indemnification from Defendants Baker, James, Streams, Bhargava, and Levine.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of StubHub, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to StubHub;

(c)     Determining and awarding to StubHub the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing StubHub and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with

applicable laws and to protect StubHub and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.  a provision to permit the shareholders of StubHub to nominate at least four candidates for election to the Board; and

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

      (e)    Awarding StubHub restitution from Individual Defendants, and each of them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 9, 2025

           **THE BROWN LAW FIRM, P.C.**

           */s/ Timothy Brown*
           Timothy Brown
           Saadia Hashmi
           Elizabeth Donohoe

Zachary Benson
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
　　　shashmi@thebrownlawfirm.net
　　　edonohoe@thebrownlawfirm.net
　　　zbenson@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Kevin Junco, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _9_ day of December, 2025.

_____
Kevin Junco